IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ERVIN DUANE WILLCOXSON, | § | |
| TDCJ #1535714, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-2839 |
| | § | |
| RICK THALER, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

State inmate Ervin Duane Willcoxson (TDCJ #1535714) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights in connection with the conditions of his confinement.  At the Court's request, Willcoxson also filed a more definite statement of his claims [Doc. # 9].  Pending before the Court is a motion for summary judgment by the defendants [Doc. # 26]. Willcoxson has replied with a cross-motion for summary judgment on his behalf [Doc. # 30].  After reviewing all of the pleadings, and the applicable law, the Court denies the plaintiff's motion.  The Court further grants the defendants' motion, in part, but withholds ruling on the remaining part for reasons set forth below.

## I.     BACKGROUND

Willcoxson is currently incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (collectively "TDCJ") at the Ellis Unit in Huntsville. Willcoxson has filed suit against the following correctional officers and health care providers employed in one capacity or another by TDCJ: Captain Dianna Field; Sergeant Kellie

Wilson; Sergeant Jacqueline Reed; Physician's Assistant Lowry Powers; and Dr. Betty Williams.[1]  Willcoxson, who entered prison with pre-existing injuries to his left hand, left wrist, and right knee, complains that he was repeatedly assigned to work as a waiter in the dining room, which forced him to perform tasks that exceeded his physical capacity and contradicted restrictions imposed by health care providers.  Willcoxson claims further that the defendants failed to help him by changing his assignment after he complained that his job duties were aggravating his pre-existing injuries.  The prison policies on inmate classification and job assignments, Willcoxson's classification and physical limitations, and Willcoxson's allegations in this case are examined in more detail below.

### A.    Inmate Classification and Job Assignments

Willcoxson was first admitted to TDCJ as a new inmate in late 2008, at approximately 50 years of age.  All inmates admitted to TDCJ are subject to screening by health care providers for "medical and/or mental impairments."[2]  During this classification process, health care providers who conduct the intake examinations assign inmates a "PULHES" score or profile using a standardized system to assess their physical capabilities "related to (1) housing, (2) physical activities and work, (3) disciplinary process, (4) individual treatment plan, and (5) transportation."[3]  The examining medical provider documents all

---

[1]    Willcoxson also filed suit against TDCJ Director Rick Thaler, who was dismissed previously for lack of personal involvement.

[2]    Doc. # 26, Ex. I, Correctional Managed Health Care Policy A-08.4, Offender Medical and Mental Health Classification.

[3]    Correctional Managed Health Care Policy A-08.4, Offender Medical and Mental Health (continued...)

restrictions on a computerized "Health Summary for Classification" form known as the "HSM-18."

After an inmate is transferred to a permanent prison facility, he may be assigned a job under TDCJ Administrative Directive 04.18 ("AD-04.18"), which governs "Offender Jobs: Assignments, Job Descriptions, Selection Criteria, Work Programs and Supervision." According to this policy, the Unit Classification Committee (the "UCC") assigns the inmate "to either a general work area or to a specific job" based on the inmate's custody level and the restrictions that are listed in the inmate's HSM-18.[4]  Under this policy, supervisors of general work areas on the unit, such as the food service department, "may be designated by the Warden to make specific job assignments within their respective department."  From the time that Willcoxson was first assigned to the Ellis Unit kitchen on June 26, 2009, through August of 2010, it appears that Captain Field was primarily responsible for making specific job assignments for the Ellis Unit kitchen, where Sergeant Wilson and Sergeant Reed were also assigned to work in a supervisory capacity.

---

[3](...continued)
    Classification, Doc. # 26, Ex. I, at 1.  The defendants explain that the PULHES system is designed to rate an offender's physical capabilities similar to systems used by the military. *See* Defendants' Motion for Summary Judgment, Doc. # 26, at 13-14.  In that respect, the PULHES system is apparently an acronym for Physical capacity or stamina, Upper extremities, Lower extremities, Hearing, vision (Eyes), and psychiatric or emotional Stability.  *See Gossage v. United States*, 91 Fed. Cl. 101, 103 n.3 (2010) (citing Army Regulation 40-501, Standards of Medical Fitness, December 1960 (rev. August 10, 1971), ¶ 9-3b); *see also Godfrey v. Warden Swift*, Civil No. 6:09-61 & 6:09-62, 2009 WL 2047530 (E.D. Tex. July 10, 2009) (referencing the "'3EP' designation on PULHES" found in the plaintiff's HSM-18).

[4]    TDCJ Administrative Directive 04.18 ("AD-04.18"), Offender Jobs: Assignments, Job Descriptions, Selection Criteria, Work Programs and Supervision, Doc. # 26, Ex. K, at 3.

A unit-level policy on classification clarifies that, when making inmate job assignments, supervisory officials must comply with the restrictions and recommendations made by health services professional treatment staff, as indicated on the inmate's HSM-18.[5] According to this policy, unit classification personnel or other facility staff designated as the reviewing authority are "responsible for ensuring that no offender is assigned to a job which is contraindicated by the offender's current health-related job restrictions." An offender may be assigned to perform temporary jobs for up to 72 hours.  Once this temporary assignment is completed, and supervisory officials have had an opportunity to evaluate the inmate's "skills, abilities, [and] limitations, . . . the appropriate department supervisor shall assign the offender to a permanent job within the department."

The TDCJ policy on job placement (AD-04.18) also takes into account changes over time to an inmate's physical capacity to work after his initial classification assignments have been made.  If an inmate's medical condition changes after the initial classification evaluation occurs, health care providers are responsible for updating the HSM-18.[6] Unit staff responsible for classification will then review the new HSM-18 to determine whether the inmate's current job assignment is contraindicated by his new job restrictions.[7]

### B.    Willcoxson's Classification and Physical Limitations

Records show that Willcoxson arrived at TDCJ on or about November 18, 2008.

---

[5]     Unit Classification Procedure 4.01, Offender Job Assignments, Doc. # 26, Ex. J.

[6]     TDCJ AD-04.18, Doc. # 26, Ex. K, at 6.

[7]     *Id.*

During his initial intake examination, Willcoxson reported that his employment history included work in construction and training horses.[8]  Willcoxson disclosed that he suffered a series of work-related injuries prior to his incarceration.  In 1993, a "bucket loader" fell on his left hand, crushing it.  Willcoxson's left wrist was fused with surgical hardware (a plate and screws) and he had limited extension in his left thumb as a result.  In addition, Willcoxson reportedly had 5 surgeries on his right knee, including the replacement of his anterior cruciate ligament ("ACL").  Willcoxson's right knee eventually developed arthritis. He also indicated that he had herniated disks in his neck.  In 1999, Willcoxson was kicked in the head by a horse.  As a result, he required medication for periodic headaches and seizures.  At some point, the "great toe" on Willcoxson's left foot required amputation for reasons that are not clear from the record.

According to Willcoxson's initial HSM-18, which is dated November 19, 2008, the nurse practitioner who conducted Willcoxson's intake examination determined that there were  no restrictions required for Willcoxson's facility of assignment or basic housing, but he was restricted to a lower bunk.[9]  The nurse practitioner also found that Willcoxson' physical impairments restricted his ability to work, limiting his assignment to jobs with limited standing, no walking over 150 yards, no lifting over 5 pounds, no repetitive squatting,

---

[8]     The defendants have filed classification records, affidavits, prison policies and procedures with their motion for summary judgment [Doc. # 26, Exhibits C through K].  The defendants have also provided medical records along with information gathered during the grievance investigation in relation to the pending complaint.  Those medical records and grievance records are filed separately from the defendants motion for summary judgment and are under seal [Doc. # 27, Exhibits A & B].

[9]     Classification Records, Doc. # 26, Ex. C, at 5.

no climbing, no repetitive use of the hands, and no work around machines with moving parts.

Willcoxson's HSM-18 was amended on March 12, 2009, to reflect his permanent assignment to the Ellis Unit in Huntsville.[10]  After some initial screening, Willcoxson was examined by Dr. Betty Williams on March 16, 2009.[11]  During that examination, Willcoxson reported pain in his right knee, left hand, and both feet.  Dr. Williams observed, however, that Willcoxson's hands and right knee appeared "normal" and that he had a full range of motion. Willcoxson was able to perform a deep knee bend and stand on his toes with "no limitation."  Willcoxson's physical examination was "essentially normal."  Dr. Williams prescribed Ibuprofen (Motrin) to treat his complaints of musculoskeletal pain.   After Dr. Williams's examination, Willcoxson was assigned to work on a medical squad.[12]  Willcoxson reports that, in this job assignment, he was given tasks that were limited to sedentary activity that involved "very little use of [his] hands."[13]  A classification official (CSM II F.D. Cross) reviewed Willcoxson's HSM-18 and confirmed that his housing and job assignment were "in compliance" with the restrictions imposed.[14]

On May 13, 2009, Willcoxson wrote to Dr. Williams.[15]  In that letter, Willcoxson complained that the herniated discs in his neck were causing "a lot of pain daily."

---

[10]     *Id.* at 6.

[11]     Medical Records, Doc. # 27, Ex. A, at 128-29, 130-39.

[12]     Classification Records, Doc. # 26, Ex. C, at 6.

[13]     Complaint, Doc. # 1, at 4.

[14]     Classification Records, Doc. # 26, Ex. C, at 6.

[15]     Medical Records, Doc. # 27, Ex. A, at 126.

Willcoxson complained further that his shoes were rubbing blisters on the knuckles of his feet.  Willcoxson advised that, in addition to the injuries he disclosed during his intake examination, his shoulder and both elbows were broken several years ago.  Willcoxson requested a medical appointment to obtain stronger medication for his pain.  Thereafter, Willcoxson was examined by P.A. Lowry, who dispensed two prescriptions (Nortriptaline and Meloxicam) and referred Willcoxson for additional medical evaluation.[16]

Willcoxson remained on the medical squad until June 26, 2009, when he was temporarily assigned to work in the food service department or kitchen for a 3-day period.[17] Shortly thereafter, on June 30, 2009, it appears that Willcoxson was permanently assigned to work as a kitchen "counter attendant" by Captain Dianna Field.[18]  Willcoxson describes the counter-attendant position as a sedentary ("sit-down") job, for the most part, that involves serving food to other inmates.[19]

Willcoxson did not take to kitchen work right away.  On July 1, 2009, Willcoxson submitted an I-60 inmate request form, advising that his assignment to the kitchen was "against [his] restrictions [but] that's ok."[20]  Willcoxson explained that he believed that prison officials needed to lift some of the restrictions in his HSM-18 because his arthritis

---

[16]     *Id.* at 124-25.

[17]     Classification Records, Doc. # 26, Ex. C, at 2.

[18]     *Id.*; Affidavit of Dianna Field, Doc. # 26, Ex. D, at 2.

[19]     More Definite Statement, Doc. # 9, at 1.

[20]     Medical Records, Doc. # 27, Ex. A, at 120.

medication was working "very well."  Willcoxson then asked for a work assignment "in the fields" or a transfer to the Powledge Unit in Palestine, Texas, "to work in the plant there." The administrator who reviewed the I-60 replied that Willcoxson's request would be discussed at a pending appointment.  The UCC evidently declined to grant Willcoxson's request for a job change or transfer, because he remained assigned to the kitchen.[21]

Willcoxson continued to receive routine medical care while he was assigned to kitchen duty.  In October of 2009, Willcoxson was treated for a sore that may have been the result a spider bite.[22]  He was also treated for swollen legs or "cellulitis."[23]  P.A. Powers examined Willcoxson on November 13, 2009, and observed "swelling associated with venous insufficiency."[24]  Willcoxson was given special stockings or "TED hose" to wear on his swollen legs.[25]

Willcoxson was examined by another physician's assistant on November 20, 2009, who observed that Willcoxson had a decreased range of motion in his upper extremities and difficulty in rising from the squatting position.[26]  This physician's assistant amended Willcoxson's HSM-18 on November 23, 2009, by changing his PULHES score, but she did

---

[21]     Classification Records, Doc. # 26, Ex. C, at 2.

[22]     Medical Records, Doc. # 27, Ex. A, at 95.

[23]     *Id.* at 87-95.

[24]     *Id.* at 85.

[25]     *Id.*

[26]     *Id.* at 79.

not change his restrictions.[27]  A classification official reviewed the amended HSM-18 and determined that Willcoxson's housing and job assignment as a kitchen counter attendant were in compliance with his restrictions.[28]

Willcoxson refused to report for a scheduled medical appointment in January of 2010.[29] After Willcoxson requested care for knee pain, he also failed to show for a scheduled visit at the clinic in March of 2010.[30]  That same month, however, Dr. Williams approved treatment for Willcoxson from the TDCJ Brace & Limb Clinic and he was fitted with special shoes or orthotics on March 25, 2010.[31]  Willcoxson also received a "gladiator knee brace."[32]

Soon after Willcoxson returned to the Ellis Unit from the Brace & Limb Clinic, he wrote to Dr. Williams and complained that his right knee was so sore he could "hardly walk on it."[33]  In that letter, which is dated April 6 , 2010, Willcoxson also complained that he had to stand to perform his work as a kitchen counter attendant because he was "unable to serve food while sitting."  A physician's assistant (M. Sanchez) examined Willcoxson on April 7,

---

[27]     Classification Records, Doc. # 26, Ex. C, at 9.

[28]     *Id.*

[29]     Medical Records, Doc. # 27, Ex. A, at 73.

[30]     *Id.* at 71, 69.

[31]     *Id.* at 65-67.

[32]     *Id.* at 50.

[33]     *Id.* at 63.

2010, and referred him for further treatment, including an x-ray of Willcoxson's right knee.[34]

The physician's assistant also prescribed pain medication, issued an elastic sleeve for

Willcoxson's right knee, and added a restriction to Willcoxson's HSM-18, which precluded

him from walking on wet or uneven surfaces.[35]   A classification official (A. Hughey)

reviewed Willcoxson's updated HSM-18 form and determined that his housing and job

assignment as a kitchen counter attendant complied with the restrictions.[36]

On April 8, 2010, Willcoxson wrote a letter to unspecified prison administrators ("To

whom it may concern"), complaining that "rank in the kitchen" were not "honor[ing] his

medical restrictions."[37]   Willcoxson reportedly complained to Captain Field and Sergeant

Wilson, in particular, but he claimed that these supervisory officials failed to help.  Instead,

the officers reportedly threatened to file a disciplinary case against Willcoxson if he refused

to do his assigned job.  Willcoxson asked to be removed from the kitchen and reassigned to

the medical squad, the garment factory, or the laundry.  On April 12, 2010, a classification

officer (B. Germany) replied that Willcoxson was "not being worked against [his] medical

restrictions."

On April 17, 2010, Willcoxson submitted an I-60 request form advising officials that

he was suffering "severe pain" in his left hand and his right knee, which was "very

---

[34]      *Id.* at 60-61.

[35]      *Id.* at 60; Classification Records, Doc. # 26, Ex. C, at 10.

[36]      Classification Records, Doc. # 26, Ex. C, at 10.

[37]      This one-page letter, which includes the hand-written administrative response, is attached
as an exhibit to Willcoxson's more definite statement [Doc. # 9].

swollen."[38] Willcoxson complained that he had very little use of his hand and that standing on his swollen leg made it difficult to work in the kitchen.  In response to these complaints, P.A. Powers issued a "lay-in" or pass that excused Willcoxson from work for at least a week.[39]  Dr. Williams examined Willcoxson on April 19, 2010.[40]  An examination of Willcoxson's knee, including x-rays, disclosed advanced degenerative changes with sclerosis. Willcoxson was told that his restrictions were "appropriate" for his medical condition and that if he had a problem with his job assignment he needed to "take this up with Classification."[41]  On April 29, 2010, Willcoxson was re-assigned to the kitchen on a temporary basis.[42]  A classification official (F.D. Cross) reviewed Willcoxson's HSM-18 and confirmed that his housing and job assignment as a temporary kitchen worker complied with his restrictions.[43]  On May 4, 2010, Willcoxson was re-assigned to work as a kitchen counter attendant.[44]

On April 30, 2010, Willcoxson filed a Step 1 grievance against Sergeant Reed, Captain

---

[38]     Medical Records, Doc. # 27, Ex. A, at 56.

[39]     Affidavit of Lowry Powers, Doc. # 26, Ex. H, at 1.

[40]     Medical Records, Doc. # 27, Ex. A, at 58.

[41]     *Id.* at 55.

[42]     Classification Records, Doc. # 26, Ex. C, at 2.

[43]     *Id.* at 11.

[44]     *Id.* at 2.

Field, and P.A. Powers.[45]  Willcoxson complained that he was "put to work" as a waiter in the dining room.  Willcoxson claimed that, after a short time in this position, his "hands started hurting from repeated use [through] serving food and [his] legs swelled up from prolong[ed] standing."  Willcoxson added that "kitchen employees" also "put [him] in the dining room as a [waiter]," where he had to "lift heavy trays and pitchers of drinks and cups" as well as "sweep and mop."  Willcoxson complained that these work assignments aggravated his pre-existing injuries and violated his restrictions, but that "the medical division" refused to reassign him to the medical squad.

On May 14, 2010, Senior Warden Eileen Kennedy responded to Willcoxson's Step 1 grievance.[46]  After investigating Willcoxson's claim about his work assignment, Warden Kennedy observed that Willcoxson had worked "in the Kitchen as a waiter during breakfast, which lasts on average 45 minutes." During that time, Warden Kennedy observed, Willcoxson could "sit down when necessary." Warden Kennedy concluded that the assigned work did not violate Willcoxson's restrictions and that there was "no evidence" to support his grievance.

On May 23, 2010, Willcoxson filed a Step 2 grievance.[47]  Willcoxson insisted that, based on the restrictions imposed initially upon his intake to TDCJ,  he belonged on a medical squad.  Willcoxson maintained further that he worked a 5-hour shift at breakfast,

---

[45]     Grievance Records, Doc. # 27, Ex. B, at 4.

[46]     *Id.* at 5.

[47]     *Id.* at 2.

carrying buckets of water and trays of cups weighing over 5 pounds in violation of his restrictions.  Willcoxson complained further that his leg was "twice its normal size."  The administrative official who replied to the Step 2 grievance on June 3, 2010, found "insufficient evidence" to support Willcoxson's claim.[48]  The official advised Willcoxson, however, to "[i]mmediately notify a supervisor" if he was assigned a duty that exceeded his restrictions.[49]  The administrative official also advised Willcoxson to contact the medical department if he felt that he needed "updates to these restrictions."[50]

On July 15, 2010, Willcoxson was escorted from the kitchen to the clinic after his hand became wedged between two barrels, causing a small cut on his hand.[51]  On August 6, 2010, Willcoxson advised that the cut on his hand was healed, but that he continued to experience pain when he moved his fingers and he requested an x-ray.[52]  An x-ray was taken and Dr. Williams examined Willcoxson on August 9, 2010.[53]  During that examination, Willcoxson complained that kitchen personnel were forcing him to lift heavy objects in violation of his restrictions.[54]  Dr. Williams noted that Willcoxson had an old injury to his

---

[48]     *Id.* at 3.

[49]     *Id.*

[50]     *Id.*

[51]     Medical Records, Doc. # 27, Ex. A, at 40.

[52]     *Id.* at 39.

[53]     *Id.* at 35.

[54]     *Id.* at 37.

left wrist, which included extensive hardware.[55]  Dr. Williams also observed signs of arthritis

in Willcoxson's hands.[56]   Dr. Williams reviewed Willcoxson's HSM-18 and noted that it

contained a restriction on lifting more than 5 pounds.[57]  Dr. Williams updated Willcoxson's

HSM-18 by adding a restriction that limited him to performing "sedentary work only."[58]  Dr.

Williams stressed to Willcoxson, however, that the medical department "DOES NOT

ASSIGN JOBS" or enforce work restrictions.[59]  Dr. Williams advised Willcoxson that, if he

believed he was being "worked against his restrictions," he should complain to the

classification department or a "higher authority."[60]

   After Dr. Williams updated Willcoxson's HSM-18, Willcoxson was temporarily

assigned to the garment factory.[61]  Shortly thereafter, on August 19, 2010, Willcoxson was

permanently assigned to work as a "garment turner," folding clothes.[62]  Willcoxson wrote to

Dr. Williams again on October 11, 2010, and complained that his knee was "killing him."[63]

Willcoxson complained that it hurt to stand or sit and he requested stronger pain medication.

---

[55]     *Id.*

[56]     *Id.*

[57]     *Id.*

[58]     *Id.* at 36.

[59]     *Id.* at 37 (emphasis in original).

[60]     *Id.*

[61]     Classification Records, Doc. # 26, Ex. C, at 3.

[62]     *Id.*

[63]     Medical Records, Doc. # 27, Ex. A, at 33.

Willcoxson noted further that his legs continued to swell, inquiring whether it could mean that he had diabetes.  That same day, Willcoxson was given a different pain medication and scheduled to be tested for diabetes.  Those tests confirmed that Willcoxson does not have diabetes.[64]

On October 26, 2010, Willcoxson complained of pain in his hand and wrist while working in the garment factory.[65]   A physician's assistant (M. Sanchez) examined Willcoxson on October 29, 2010.[66] The physician's assistant observed that Willcoxson's left wrist was surgically fused and that he was unable to move his thumb, but that he had full range of motion in his fingers.[67]  Shortly thereafter, on November 3, 2010, Willcoxson was temporarily assigned to the kitchen.[68]  On November 8, 2010, Willcoxson was permanently assigned to his former job as a kitchen counter attendant.[69]  Thereafter, Willcoxson was examined in the clinic on December 1, 2010, for complaints of "pain in both hands."[70]  A nurse practitioner (B. Hough) referred Willcoxson for additional treatment, but advised Willcoxson that his HSM-18 contained the "proper restrictions for his medical condition," and reminded him that it his responsibility to get "security" personnel to honor those

---

[64]     *Id.* at 15.

[65]     *Id.* at 28.

[66]     *Id.* at 24-26.

[67]     *Id.* at 24.

[68]     Classification Records, Doc. # 26, Ex. C, at 3.

[69]     *Id.*

[70]     Medical Records, Doc. # 27, Ex. A, at 10.

restrictions.[71]

### C.    Willcoxson's Allegations

The classification records show that Willcoxson remains assigned to work in the kitchen as a counter attendant.  According to the complaint and more definite statement, Willcoxson contends that he has been repeatedly assigned to perform work in the kitchen that aggravates his pre-existing knee and wrist injuries.  Willcoxson complains, in particular, about being assigned to perform work as a waiter in the dining room, which required him to lift heavy objects weighing over 5 pounds and also required prolonged standing.  Willcoxson claims that, when he attempted to refuse the waiter assignment, he was threatened with a disciplinary case.  By failing to re-assign him to the medical squad, which featured only sedentary work with little use of the hands, Willcoxson contends that the defendants have been deliberately indifferent to his complaints of pain.  Willcoxson seeks $50,000 in compensatory and punitive damages from the defendants in their official and individual capacities.  Willcoxson also requests injunctive relief in the form of an order directing the defendants to reassign him to the medical squad.

After considering Willcoxson's complaint and more definite statement under 28 U.S.C. § 1915A, the Court requested an answer from the individuals who were purportedly involved in making or approving Willcoxson's work assignments, namely, Captain Field, Sergeant Wilson, Sergeant Reed, P.A. Powers, and Dr. Betty Williams.  These defendants have filed a joint motion for summary judgment, arguing that Willcoxson cannot establish

---

[71]     *Id.*

a valid claim as a matter of law. Willcoxson has filed a cross-motion for summary judgment in his favor. The parties' contentions are addressed below under the appropriate standard of review.

## II.  STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Under this rule, a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 248 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.*

If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-movant to provide specific facts showing the existence of a genuine issue for trial. *See Matsushita*, 475 U.S. at 587. In deciding a summary judgment motion, the reviewing court must "construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotation marks omitted). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v.*

*Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Further, the court has no obligation under Rule 56 "to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006) (quotation omitted).

The plaintiff proceeds *pro se* in this case.  Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys.  *See Haines v. Kerner*, 404 U.S. 519 (1972); *Bledsue v. Johnson*, 188 F.3d 250, 255 (5th Cir. 1999). Pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them.  *See Haines*, 404 U.S. at 521; *see also United States v. Pena*, 122 F.3d 3, 4 (5th Cir. 1997) (citing *Nerren v. Livingston Police Dept.*, 84 F.3d 469, 473 & n.16 (5th Cir. 1996)).  Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion.  *See Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

## III.  DISCUSSION

As outlined above, Willcoxson complains that he was assigned to work as a waiter in the dining room, which required him to lift heavy objects weighing over 5 pounds in violation of the restrictions found in his HSM-18.  Willcoxson argues that, because of his physical limitations, he should be limited to sedentary work that requires little use of the hands.  Willcoxson maintains, therefore, that the defendants have been deliberately

indifferent to his complaints of pain during the process of assigning him a job.

### A.    Official Capacity Claims

Willcoxson seeks damages against all of the defendants under 42 U.S.C. § 1983.  This statute provides a private right of action for damages to individuals who are deprived of "any rights, privileges, or immunities" protected by the Constitution or federal law by any person acting under the color of state law.  42 U.S.C. § 1983; *Breen v. Texas A&M Univ.*, 485 F.3d 325, 332 (5th Cir. 2007).  To establish liability under § 1983, a civil rights plaintiff must establish two elements:  (1) state action, *i.e.*, that the conduct complained of was committed under color of state law, and (2) a resulting violation of federal law, *i.e.,* that the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *Baker v. McCollan*, 443 U.S. 137, 142 (1979); *see also Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002) (In short, "[s]ection 1983 provides a claim against anyone who, 'under color of' state law, deprives another of his or her constitutional rights.") (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994)).

The defendants note that a state employee acting in his or her official capacity is not a "person" subject to suit under 42 U.S.C. § 1983.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  The defendants argue further that Willcoxson's claims against them in their official capacity as TDCJ employees are barred by the Eleventh Amendment to the

19

United States Constitution.[72]   Federal court jurisdiction is limited by the Eleventh

Amendment and the principle of sovereign immunity that it embodies.  *See Seminole Tribe*

*of Florida v. Florida*, 517 U.S. 44, 54 (1996); *see also Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89, 100 (1984) (explaining that the Eleventh Amendment acts as a

jurisdictional bar to suit against a state in federal court).   Unless expressly waived, the

Eleventh Amendment bars an action in federal court by, *inter alia*, a citizen of a state against

his or her own state, including a state agency.  *See Martinez v. Texas Dep't of Criminal*

*Justice*, 300 F.3d 567, 574 (5th Cir. 2002).

As a state agency, TDCJ is immune from a suit for money damages under the

Eleventh Amendment.  *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).  It is also

settled that the Eleventh Amendment bars a recovery of money damages under 42 U.S.C.

§ 1983 from state employees in their official capacity.  *See Oliver v. Scott*, 276 F.3d 736, 742

(5th Cir. 2001); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir.

1998).  To the extent that Willcoxson seeks monetary damages in this case, the Eleventh

Amendment bars his claims against the defendants in their official capacity as state

employees.[73]  The defendants' motion for summary judgment on Willcoxson's request for

---

[72]   The Eleventh Amendment states: "The Judicial power of the United States shall not be
construed to extend to any suit in law or equity, commenced or prosecuted against one of the
United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
U.S. CONST. amend. XI.

[73]   A narrow exception to Eleventh Amendment immunity exists for suits brought against
individuals in their official capacity, as agents of the state or a state entity, where the relief
sought is injunctive in nature and prospective in effect.  *See Aguilar*, 160 F.3d at 1054 (citing
*Ex parte Young*, 209 U.S. 123 (1980)).  In other words, an exception exists where a plaintiff
(continued...)

monetary damages will be granted.

**B.    Individual Capacity Claims — Qualified Immunity**

Willcoxson complains that the defendants violated his constitutional rights under the Eighth Amendment by assigning him to work as a waiter in violation of his medical restrictions.   Captain Field, Sergeant Reed, and Sergeant Wilson argue that Willcoxson cannot show that he was assigned him to perform work with deliberate indifference to a serious medical condition in violation of the governing constitutional standard found in the Eighth Amendment.   Dr. Williams and P.A. Powers argue that they had no personal involvement in Willcoxson's work assignment and, therefore, he cannot show that they were deliberately indifferent to his medical needs.   On this basis, the defendants maintain that they are entitled to qualified immunity from liability for Willcoxson's claims against them in their individual or personal capacity.

Public officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity.   *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Qualified immunity protects government employees against civil liability in their individual capacity "insofar as their conduct does not violate clearly established

---

[73](...continued)
demonstrates a claim against state officials for prospective injunctive relief to prevent a continuing violation of federal law. *See Green v. Mansour*, 474 U.S. 64, 68 (1985); *Edelman v. Jordan*, 415 U.S. 651, 666-68 (1974).   Willcoxson seeks injunctive relief in the form of a job assignment to the medical squad.   Willcoxson does not establish that any of the defendants have authority to make such a job assignment. More importantly, inmates do not have a constitutional right to a particular job assignment. *See Jackson v. Cain*, 864 F.2d 1235, 1247 (5th Cir. 1989).   Because Willcoxson does not demonstrate that prospective relief is available, the Court does not address the claim for injunctive relief further.

statutory or constitutional rights of which a reasonable person would have known." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Harlow*, 458 U.S. at 818)) (internal quotation marks omitted).  In doing so, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. Al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2085 (2011).  Thus, the doctrine of qualified immunity "shields from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'"  *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

To determine whether a public official is entitled to qualified immunity for an alleged constitutional violation, reviewing courts engage in a two-prong inquiry.  *See Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009).  The first prong of the analysis asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right that was "clearly established" at that time.  *See id.*, 129 S. Ct. at 815-16;  *Scott v. Harris*, 550 U.S. 372, 377 (2007) (citation omitted).  The second prong of the analysis asks whether qualified immunity is appropriate, notwithstanding an alleged violation, because the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question."  *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.*, 543 F.3d 221, 225 (5th Cir. 2008) (quoting *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007)).  A reviewing court may consider these prongs in any sequence.  *See Pearson*, 129 S. Ct. at 818.

The usual summary judgment burden of proof is altered in the case of a qualified

immunity defense.  *See Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).  An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law.  *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct.  *See Michalik*, 422 F.3d at 262; *see also Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (noting that, to avoid summary judgment on qualified immunity, a plaintiff need not present "absolute proof," but must offer more than "mere allegations") (quotation omitted).  In this case, the Court finds it appropriate to examine initially whether the plaintiff establishes a constitutional violation of the Eighth Amendment to the United States Constitution, which prohibits deliberate indifference to serious health and safety needs.

### 1.    Eighth Amendment — Deliberate-Indifference Standard

It is well established that a prison official's "deliberate indifference to serious medical needs of prisoners" can constitute "unnecessary and wanton infliction of pain" of the type proscribed by the Eighth Amendment and actionable under 42 U.S.C. § 1983.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  In this context, it is "obduracy and wantonness, not inadvertence or error in good faith," that characterizes the conduct prohibited by the Eighth Amendment, "whether that conduct occurs in connection with establishing conditions of

confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).   "Thus, the prison official's state of mind must be examined to determine whether the undue hardship endured by the prisoner was a result of the prison official's deliberate indifference." *Bradley*, 157 F.3d at 125 (citing *Wilson v. Seiter*, 501 U.S. 294 (1991)).

To establish the requisite deliberate indifference, a prisoner must show that the defendants were both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).   The Fifth Circuit has held that the deliberate-indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).   Under the subjective prong of this analysis, "[a] prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 347 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847).

Prison work requirements can constitute cruel and unusual punishment where they (1) compel an inmate to perform physical labor that is beyond his strength, (2) endanger the inmate's life, or (3) cause the inmate to suffer undue pain. *See Howard v. King*, 707 F.2d 215, 219 (5th Cir. 1983) (citing *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977)).   "[T]he

constitutionality of a particular working condition must be evaluated in light of the particular medical conditions of the complaining prisoner." *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989). To determine whether a work assignment violates the constitution, a court may also consider such factors as the number of hours worked per day and the type of labor performed. *See Howard*, 707 F.2d at 220 (holding that inmates stated a cause of action when they alleged that they had been forced to work a total of 56 hours, seven days per week in a field for over a year and had been deprived of proper rest); *see also Jackson*, 864 F.2d at 1239, 1247 (observing that 47 days of working "in a barn shoveling unshucked corn that was over a year old and contaminated with rats' nests, insects, and clods of white, sandy dust[;]" working unmasked and covered with corn dust; and pushing an iron wagon approximately 80 feet ten times each day constituted a cause of action under the Eighth Amendment).

Work that is not "cruel and usual *per se*" may still violate the Eighth Amendment if the officials knew it would significantly aggravate a serious medical condition. *Jackson*, 864 F.2d at 1246. In other words, if prison officials knowingly force a prisoner to engage in work "which they knew would significantly aggravate [a] serious physical ailment," then such a decision "would constitute deliberate indifference to serious medical needs" in violation of the Eighth Amendment. *Id.* Willcoxson's claims against the individual defendants are examined briefly below in light of this standard, beginning with his allegation that Dr. Williams and P.A. Powers caused him to be assigned a job that violated his medical restrictions.

a.      **Dr. Williams and P.A. Powers**

Willcoxson complains that he was assigned to work as a waiter in the dining room, where he was forced to lift heavy objects in violation of medical restrictions outlined in his HSM-18. Willcoxson contends that Dr. Williams and P.A. Powers violated his constitutional rights because, after he complained about his job, these defendants failed to change his job assignment. By failing to change his job assignment or enforce the medical restrictions, Willcoxson reasons that Dr. Williams and P.A. Powers caused him to perform work that aggravated his pre-existing injuries.

Dr. Williams and P.A. Powers argue that they are entitled to qualified immunity from liability for Willcoxson's claims against them in their individual or personal capacities because they did not have the requisite personal involvement with the alleged constitutional violation. They argue, in particular, that they had no authority to make job assignments or to enforce medical restrictions and that this information was communicated to Willcoxson during the course of providing treatment. Dr. Williams and P.A. Powers contend, therefore, that they did not act with deliberate indifference to Willcoxson's medical condition.

In his affidavit, P.A. Powers acknowledges that he examined Willcoxson several times in 2009 for complaints of knee, neck, and hand pain.[74] P.A. Powers maintains, however, that Willcoxson did not inform him that he was being "worked against his restrictions" until April 19, 2010. In response to Willcoxson's complaint, P.A. Powers "educated [Willcoxson] on his restrictions and advised him to take up his working assignment with the Unit

---

[74]      Affidavit of Lowry Powers, Doc. # 26, Ex. H.

Classifications Committee."  P.A. Powers explained to Willcoxson that, even though the medical department imposes work-related restrictions that are documented in the HSM-18, medical providers are "not responsible for an inmate's job assignment."

Dr. Williams also acknowledges, in her affidavit, that Willcoxson was treated in the medical department on several occasions for various complaints.[75]  The medical records, which are summarized in more detail above, show that Dr. Williams examined Willcoxson on August 9, 2010, where he complained of pain in his hands as the result of lifting heavy objects at work.[76]  Records of that examination show that Dr. Williams observed that Willcoxson was right-handed and that he had suffered a work-related injury to his left hand in the past.  An x-ray confirmed that Willcoxson had "extensive [h]ardware" in his left wrist and deformities in both hands.  Dr. Williams reviewed Willcoxson's HSM-18, and noted that it contained a restriction on lifting more than 5 pounds.  Dr. Williams explained to Willcoxson during the examination that the Medical Department "DOES NOT ASSIGN JOBS" or enforce restrictions.  Therefore, she advised Willcoxson to complain to the Classification Department or a "higher authority" about his job assignment.

In addition, Dr. Williams explains in her affidavit that medical care in TDCJ is provided pursuant to a contract with UTMB.  In providing that care, UTMB medical workers are limited to performing "medical functions," such as "physical examinations, diagnosis and treatment of diseases and injuries, and assignment of appropriate work restrictions to prevent

---

[75]     Affidavit of Betty Williams, MD, Doc. # 26, Ex. G.

[76]     Medical Records, Doc. # 27, Ex. A at 37 (emphasis in original).

further injury/disability . . . [.]" Dr. Williams emphasizes that making individual job assignments is not a medical function. Instead, the assignment of those jobs necessary for carrying out prison operations is "solely the responsibility" of TDCJ employees, and not medical workers under contract with UTMB.

Personal involvement is an essential element of a civil rights cause of action, meaning that there must be an affirmative link between the injury and the defendants' conduct. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976)). Willcoxson, who filed a detailed response to the defendants' summary-judgment motion, does not dispute any of the facts asserted by Dr. Williams or P.A. Powers, which are supported by the medical records in this instance. Likewise, as outlined above, TDCJ policy (Administrative Directive 04.18) plainly vests authority to make permanent inmate job assignments with the Unit Classifications Committee. Importantly, Willcoxson does not allege or show that P.A. Powers or Dr. Williams failed to impose appropriate restrictions for his medical condition. In that regard, the record shows that P.A. Powers and Dr. Williams treated Willcoxson in response to his complaints and updated his HSM-18 accordingly. Willcoxson's primary complaint is that supervisory officials in the kitchen did not abide by the restrictions imposed by health care providers when assigning him work. Absent an allegation that Dr. Williams or P.A. Powers were personally involved in the decision to assign Willcoxson a particular work detail, or that they failed to impose appropriate restrictions for his medical condition, Willcoxson's does not raise a genuine issue of material fact on whether Dr. Williams and P.A. Powers were personally involved with or

responsible for violating his constitutional rights.  As a result, Dr. Williams and P.A. Powers are entitled to summary judgment on the defense of qualified immunity.

### b.     Captain Field, Sergeant Wilson, and Sergeant Reed

Willcoxson appears to contend that, while he was assigned to work as a counter attendant in the kitchen, supervisory personnel in the kitchen forced him to function as a waiter in the dining room.  As a waiter, Willcoxson complains that he was made to lift heavy items in violation of the medical restrictions outlined in his HSM-18, which preclude lifting more than 5 pounds.  Willcoxson appears to claim that, as supervisory officials in charge of kitchen work assignments, Captain Field, Sergeant Wilson, and Sergeant Reed, knew about his medical restrictions and his complaints of pain, but refused to reassign him to an "easier job."

According to Captain Field, an "internal tracking form used in the kitchen," shows that Willcoxson was assigned to work as a waiter, temporarily, on June 29, 2009, April 29, 2010, and November 10, 2010, until a permanent job assignment could be made.[77]  Sergeant Reed indicates that Willcoxson would "sometimes" volunteer to work as a waiter because he disliked being a counter attendant.[78]  Willcoxson does not dispute that he was assigned to work as a waiter temporarily on only three occasions.  Nor does Willcoxson deny that he volunteered to work as a waiter on other occasions.  Willcoxson appears to maintain, instead, that he should not have been assigned to work as a waiter at all because of the restrictions

---

[77]     Affidavit of Dianna Field, Doc. # 26, Ex. D, at 2.

[78]     Affidavit of Jacqueline Reed, Doc. # 26, Ex. F, at 2.

found in his HSM-18, which preclude lifting items such as heavy trays and containers filled with liquid weighing over 5 pounds.

The record does not adequately address whether the temporary waiter assignments were made by the Unit Classification Committee, an individual official in charge of the food service department, or one of the ranking officers supervising one of Willcoxson's shifts in the kitchen. Further, if the temporary waiter assignment was made by an officer or official in charge of the kitchen, or if Willcoxson was allowed to work as a waiter voluntarily, it is not clear whether kitchen personnel had access to Willcoxson's HSM-18, which listed his medical restrictions. Likewise, the record contains no specific information showing how many shifts Willcoxson was assigned to work as a waiter, the number of hours that he worked per day, or the type of labor that he performed during his temporary waiter assignments. *See Howard*, 707 F.2d at 220. Because the record is not presently sufficient to address these issues, the Court is unable to make a determination on the claims of qualified immunity by Captain Field, Sergeant Wilson, and Sergeant Reed. Therefore, the Court will withhold ruling on this portion of the defendants' motion for summary judgment until the parties provide supplemental briefing.

## IV.    CONCLUSION AND ORDER

Accordingly, based on this record, the Court **ORDERS** as follows:

1.    The defendants' motion for summary judgment [Doc.# 26] is **GRANTED**, in part, with respect to the plaintiff's claims for monetary damages and the claims against Dr. Betty Williams and P.A. Lowry Powers.

2.      The defendants shall submit supplemental briefing on the claims against Captain Dianna Field, Sergeant Kellie Wilson, and Sergeant Jacqueline Reed and the defense of qualified immunity within 60 days of the date of this order.

3.      After the defendants have filed supplemental briefing, the plaintiff shall submit a response within 30 days of the date shown on the defendants' certificate of service.

4.      The plaintiff's motion for summary judgment [Doc. # 30] is **DENIED**, at this time, subject to reconsideration by the Court after the parties have submitted supplemental briefing as to the claims against Captain Dianna Field, Sergeant Kellie Wilson, and Sergeant Jacqueline Reed.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas, on November 29, 2011.

Nancy F. Atlas
United States District Judge