UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ERVIN DUANE WILLCOXSON,　§
TDCJ # 1535714,　　　　　　　§
　　　　　　　　　　　　　　§
　　　　Plaintiff,　　　　　　§
　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　§　　CIVIL ACTION NO. H-10-2839
　　　　　　　　　　　　　　§
RICK THALER, *et al*.,　　　　§
　　　　　　　　　　　　　　§
　　　　Defendants.　　　　　§

## MEMORANDUM AND ORDER

State inmate Ervin Duane Willcoxson (TDCJ #1535714) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights in connection with the conditions of his confinement.  Doc. # 1.  Specifically, Willcoxson complains of deliberate indifference by health care providers and work supervisors at the Ellis Unit.

At the Court's request, Willcoxson filed a more definite statement providing more details about his claims.  Doc. # 9.  Subsequently, the Court ordered service of process on the defendants.  The defendants submitted a Motion for Summary Judgment that the Court granted in part in a Memorandum and Order.  Doc. # 31.  The Court dismissed health care provider defendants.  Pursuant to the Court's

Memorandum and Order, the remaining defendants, Captain Dianna Field, Sergeant Jacqueline Reed, and Sergeant Kellie Wilson, the latter two of whom supervised Willcoxson's work, have filed a Supplemental Motion for Summary Judgment supported by additional evidence. Doc. # 32.   After reviewing all of the pleadings and applicable law, the Court concludes that the motion must be **granted** and that the case must be **dismissed** for reasons that follow.

## I.   FACTUAL BACKGROUND

### A.   Chronology of Willcoxson's Medical and Complaint History

Willcoxson, who is 54 years old, is currently incarcerated at Ellis Unit of the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ") located north of Huntsville in Walker County, Texas.   Before being incarcerated in 2008, Willcoxson was employed as a construction worker and a horse trainer.  He states that he suffered multiple job related injuries including one in 1993 in which a loader bucket crushed his left hand.  The injury required surgery involving the installation of a plate and screws which helped to fuse his fractured bones but limited his left thumb's use.  Willcoxson also reports that he takes medication for periodic headaches and seizures after a horse kicked him in the head in 1999.  He also states that he has an arthritic right knee, having undergone five surgeries, including the replacement of his anterior cruciate

2

ligament ("ACL").  Further, the record indicates that Willcoxson has herniated disks in his neck and his left "great toe" was amputated distally.  Doc. # 27-3, at 19, Doc. # 27-4, at 34.

Officials at TDCJ generated a Health Summary for Classification ("HSM-18") for Willcoxson on November 19, 2008.  Doc. # 26-2, at 6; Doc. #32-2, at 7. Although there were no restrictions imposed regarding Willcoxson's unit assignment or housing, he had a designation for  a lower bunk.  Doc. # 26-2, at 6. There were also work limitations entered that entailed limited standing and prohibited jobs that required Willcoxson to walk more than 150 yards or lift more than 5 pounds.  He was also barred from jobs that required climbing, repetitive squatting, or repetitive use of his hands.  *Id.*  Finally, Willcoxson could not be assigned to work around machinery with moving parts. Doc. # 26-6, at 6.

On March 12, 2009, Willcoxson's HSM-18 was amended to reflect his transfer to the Ellis Unit.  Doc. # 32-2, at 7.  Dr. Betty Williams examined Willcoxson on March 16, 2009.  Doc. # 27-4, at 6.  During the examination, Willcoxson complained about pain in his right knee, left hand, and both of his feet. However, Dr. Williams observed that Willcoxson's hands and knee appeared normal with a full range of motion.  *Id.*  She also noted that Willcoxson was able to perform deep knee bends and stand on his toes with "no limitation."  Dr. Williams concluded that Willcoxson's physical examination was "essentially normal."  *Id.*

Willcoxson was assigned to a medical squad[1] after the examination.  Doc. # 26-2, at 3, 7.

On May 13, 2009, Willcoxson wrote to Dr. Williams complaining about arthritis and other physical ailments.  Doc. # 27-4, at 4.  Willcoxson mentioned that a nurse had recently examined his knee and was informed about his history of surgeries; however, the nurse was not responsive to Willcoxson's complaints. Willcoxson reminded Dr. Williams of the herniated disks in his neck and added that he had suffered a broken shoulder requiring surgery a few years earlier. Willcoxson further complained that his shoes were rubbing blisters on the knuckles of his feet.  He ended this letter to the medical unit of the TDCJ with a request for a visit and medication for his arthritis.  *Id.*  Subsequently, Physician's Assistant ("P.A.") Lowry Powers examined Willcoxson and prescribed two medications.  *Id*. at 3.  Powers also noted Willcoxson's partially amputated great toe and referred him for evaluation for medical boots.  *Id*. at 2.

Willcoxson's records reflect that he remained in the medical squad until June 26, 2009, when he was assigned to the kitchen unit on a temporary basis for 72 hours.  Doc. # 26-2, at 3.  Although Willcoxson's assignment was made on June 26, he only worked as a counter attendant/waiter for one day, on June 29, 2009.

---

[1]    A medical squad is a job detail in which an inmate's work responsibilities are limited.  Often there are more rest periods, and more attention is paid to individual work restrictions ordered by the prison medical staff.  *See, e.g., Carter v. Price*, 24 F.3d 238, 1994 WL 242887, *1 (5th Cir. 1994).

Doc. # 32-2, at 3; Doc. # 32-8, at 8.[2]  On June 30, Captain Dianna Field, who was in charge of the day shift at the kitchen, assigned Willcoxson to work as a counter attendant in the kitchen.  Doc. # 26-2, at 3; Doc. # 26-3, at 2.  According to Willcoxson (and not disputed by the defendants), a kitchen counter attendant is primarily a sedentary position.  Doc. # 9, at 1.

On July 1, 2009, Willcoxson sent P.A. Powers an "I-60" prison form to P.A. Powers complaining that he had been assigned to work in the kitchen and claimed this assignment was "against [his] [l]imitations [but] that's OK."  Doc. # 27-3, at 60.  Willcoxson also reported that his arthritis medication was performing well and that he hoped to increase the dosage for headache pain medication.  He also declared that he could "work in the fields" and requested a transfer to the Powledge Unit "to work in the plant there."  *Id.*  There is no entry in the records indicating that Willcoxson's transfer request was granted.  Doc. 26-2, at 3.

Willcoxson's medical records then reveal an I-60 form, dated August 10, 2009, containing complaints about about pain and swelling in his knee and wrists. Doc. # 27-3, at 56.  The form indicated that the maladies arose while he was assigned to work in the kitchen and that he now sought help with his medication

---

[2]     The record is ambiguous as to Willcoxson's specific job assignment and the specific date.  One record, the computer generated Housing/ Job Assignment History, reflects that he was assigned to work as a counter attendant on June 30, 2009.  Doc. # 26-2, at 3.  Another record, a manually generated duty schedule reflects that he worked as a "CA /Waiter" (Counter Attendant Waiter) on June 29, 2009.  For sake of analysis, the court will assume that Willcoxson was given the job with broader duties.

and his placement.   However, Willcoxson, despite his complaints, refused to appear for a medical appointment the next day.  Doc. # 27-3, at 53-54.  Willcoxson also failed to appear for a sick call a couple of weeks later, on August 24, 2009, after complaining that he could not work in the kitchen because he was compelled to lift items weighing more than five pounds.  *Id.* at 49.  Dr. Williams examined Willcoxson and, after observing that his gait was normal, noted no acute distress ("NAD").  The doctor noted mild osteoarthritic changes to his hands.  Dr. Williams made no changes to Willcoxson's work restrictions, although she prescribed Meloxicam, a non-steroidal, anti-inflammatory drug.  Dr. Williams requested that Willcoxson's work restrictions be honored.  *Id.*[3]

On October 22, 2009, Willcoxson reported a painful spider bite on his left leg; however, he refused treatment from the unit nursing station while acknowledging the possible harmful consequences of taking no action.  Doc. # 27-3, at 45-48.  He also repeated his request for medical boots.  *Id.* at 44.  Nurse Darrell Springer, R.N., saw Willcoxson on October 25, and noted his wound.  *Id.* at 42.  After consulting with P.A. Powers, Springer gave Willcoxson Bactrim and Motrin and instructed him to take each medication twice daily.  *Id.* at 42-43.

Subsequently, Willcoxson complained about leg swelling and was issued TED hose on October 29, 2009.  *Id.* at 35-37.  Powers saw Willcoxson again on

---

[3]     There was no indication that the restrictions had been violated.

November 13, 2009.  *Id*. at 25.  After observing leg "swelling associated with venous insufficiency," Powers ordered new TED hose for Willcoxson.  Another P.A., Melissa Sanchez, examined Willcoxson on November 20, 2009.  *Id.* at 19-20. She noted a decrease in the range of motion in Willcoxson's neck, shoulders, and wrists.  *Id*. at 19.  She also observed that he had difficulty rising from the squatting position.  Doc. # 27-3, at 19.  However, she also noted that there was no knee swelling or discoloration.  *Id.*   Sanchez changed the PULHES[4] health profile on Willcoxson's HSM-18 but did not alter his work assignment restrictions.  *See* Doc. 26-2, at 9-10.  Consequently, no change was made regarding his job qualifications. *Id.*

Willcoxson continued to complain about his knee and requested medical attention in January and March of 2010, but he refused to attend the scheduled visits in part, he claimed, because of discomfort from his physical ailments.  Doc. # 27-3, at 9-11; 13-15.  After being approved for treatment at the TDCJ Brace and Limb Clinic, Willcoxson was fitted with orthotics and a knee brace during March and April, 2010.  *Id.* at 5; Doc. # 27-2, at 52.

---

[4]     The military services established the "PUHLES" numeric system for rating a patient's physical health by assigning a number from one to four in the following categories: Physical capacity or stamina, Upper extremities, Lower extremities, Hearing – ears, Eyes, and pSychiatric.  *Gossage v. United States*, 91 Fed. Cl. 101, 103 n.3 (Fed. Cl. 2010).  Every inmate in the TDCJ is classified for housing and work using the PUHLES system.  *See Porter v. Thaler*, No. H-12-0293, 2012 WL 2841420 (S.D. Jul. 9, 2012).

Willcoxson's complaints about his condition and his work persisted.   On April 6, 2010, he sent Dr. Williams a letter telling her that his knee was so sore that he "could hardly walk on it."   He also told her his current job as a counter attendant required him to stand because he could not serve food while sitting. Doc. # 27-3, at 3.   P.A. Sanchez examined Willcoxson the next day, noted a decrease in his range of motion along with increased fluid build-up, and referred him for a right knee x-ray.  Doc. # 27-2, at 62.  She prescribed an elastic sleeve and more Meloxicam for Willcoxson.  She revised his HSM-18 to reflect that he was prohibited from walking on wet or uneven surfaces.  Doc. # 26-2, at 11.  An official in the Unit Classification Department ("UCC") reviewed Willcoxson's HSM-18 on April 8, 2010**,** which was after Sanchez's revision to Willcoxson's work restrictions.  The UCC determined that his existing job assignment remained in compliance with the revised restrictions.  *Id.*

On April 8, 2010, Willcoxson sent a letter to unnamed officials ("TO WHOM IT MAY CONCERN") complaining that his work restrictions were being violated.  Doc. # 9, at 10.   Willcoxson cited the  restrictions against repetitive use of hands, walking over 150 yards, walking on uneven or wet surfaces, lifting over 5 pounds, and prolonged standing.   He then declared that these restrictions prohibited him from being assigned to work in the kitchen.  Despite this alleged prohibition, Willcoxson was ordered to do work in the kitchen that violated his

restrictions and was threatened with disciplinary action if he refused to comply. Willcoxson requested that he be removed from the kitchen and expressed his willingness to work in the garment factory or in the laundry if a position could be found that did not violate his work restrictions.  On April 12, 2010, B. Germany, a UCC classification officer, denied Willcoxson's request stating, "You are not being worked against your medical restrictions."  *Id.*

Meanwhile, Willcoxson was examined again, this time by a radiologist, on April 9, 2010.  Doc. # 27-2, at 60.  The radiologist noted osteoarthritic changes with sclerosis within the upper tibial plateau region but also remarked that no acute changes were observed.  The report was issued on April 15, and P.A. Sanchez made a referral for further evaluation of Willcoxson.  *Id*. at 59.

Willcoxson submitted an I-60 form again complaining about his condition on April 17, 2010.  Doc. # 27-2, at 58.  This time he declared that his left hand and knee were painful and swollen as a result of his kitchen job, which required him to work in violation of his restrictions.  He protested that he had very little use of his hand and that standing caused swelling in his leg.  He again requested relief from kitchen duty.  In response, P.A. Powers saw Willcoxson on April 19, 2010, and concluded again that his work restrictions still were appropriate.  *Id.* at 57.  P.A. Powers also counseled Willcoxson about his restrictions and advised him to address his work assignment concerns to the UCC**.**  Doc. # 26-7, at 3.

9

The job records show that Willcoxson was working in the kitchen  pursuant to a 72-hour temporary assignment on April 29, 2010.  Doc. # 26-2, at 3; Doc. # 32-8, at 8.  The record also shows that he worked as a waiter on the night shift that day.  Doc. # 32-8, at 8.   On May 3, 2010, a UCC classification officer confirmed on Willcoxson's HSM-18 that the job assignment still complied with his restrictions.  Doc. # 32-2, at 12.  The next day, Willcoxson was reassigned to work as a counter attendant.  *Id.* at 3.

In the meantime, on April 30, 2010, Willcoxson filed a Step 1 grievance against Sergeant Reed, Captain Field, and P.A. Powers.   Doc. # 27-6, at 5. Willcoxson complained that his hands hurt from repeated use when he served food in the dining room.  He also stated that he was required to lift heavy trays and pitchers of drinks, and that he also had to sweep and mop.  Willcoxson stated that he could not perform his assigned tasks and he requested that he be returned to the medical squad.  On May 14, 2010, Warden Eileen Kennedy responded that his claim was investigated and no evidence was found to support it.  *Id.*  In making this conclusion, Warden Kennedy noted that Willcoxson worked during breakfast which on average lasted 45 minutes and that he was allowed to sit down when necessary.  Therefore, she found that no action was necessary and denied the grievance.  *Id.*

10

On May 23, 2010, Willcoxson filed a Step 2 grievance appealing Warden
Kennedy's denial and challenging her findings.  Doc. # 27-6, at 3.  Willcoxson
declared that he had been originally assigned to a medical squad when he entered
the prison system and he reiterated his restrictions regarding lifting, walking,
climbing, and repetitive use of hands.   He also stated that he worked a five hour
shift (1 a.m. to 6 a.m.) and that his duties are not confined to the specific meal
time.  Willcoxson complained that he was carrying trays in excess of his weight
limitation and that he had to go to the infirmary on numerous occasions because of
the excessive work.  He also complained that his leg was "twice its normal size."
The Step 2 grievance was denied based on the finding that there was insufficient
evidence to support Willcoxson's claim that he was being forced to work outside
of his medical restrictions.   *Id.*   The reviewing official advised Willcoxson to
notify a supervisor if he thought his assignment violated a restriction, or contact
the Medical Department if he felt that his restrictions needed updating.

On July 15, 2010, Willcoxson was seen in the medical unit for an injured left
hand that had been caught between two barrels.  Doc. # 27-2, at 42-48.  He was
treated with a cold pack and given ibuprofen.  On August 6, 2010, Willcoxson filed
an I-60 form concerning the hand injury.  *Id.* at 41.  He reported that the cut had
healed but that he was experiencing pain when he moved his fingers.  He also
stated that he had been told that an x-ray would be taken but that he had yet to

receive one.  Dr. Williams saw him on August 9, and took x-rays.  *Id.* at 39.    Dr. Williams noted that the x-ray revealed extensive hardware in the left wrist.  She also observed that there were deformities in the right hand.  Dr. Williams verified that Willcoxson's HSM-18 had a five pound lifting restriction.  She modified the HSM-18 to include a restriction for "sedentary work only."  Doc. # 27-2, at 38-39. However, Dr. Williams made it clear to Willcoxson that her department, the University of Texas Medical Branch (UTMB"), which has a contract to provide medical services to the prison system, is not authorized to make job assignments or enforce work restrictions.  *Id.* at 39; *see also* Affidavit of Betty Williams, Doc. # 26-6, at 3.  Dr. Williams advised Willcoxson to complain to the UCC or a higher authority if he felt that he was being worked against his restrictions.  *Id.*  Dr. Williams also observed that Willcoxson had previously worked in construction and horse training despite his old injuries. Doc. # 26-6, at 4.  She remarked that such work was far more demanding and dangerous than serving food or wiping down tables.  *Id.*

    After William's examination of Willcoxson and her revision of his HSM-18, Willcoxson was transferred to the garment factory on a temporary basis on August 18, 2010.  Doc. # 26-2, at 4.  The next day, he was permanently assigned there as a garment turner.  *Id.*

In spite of the desired job change, Willcoxson's physical complaints continued. On October 11, 2010, he wrote Dr. Williams a letter telling her that his knee was "killing" him and that it hurt whether he was standing, sitting or working [Doc. 27-2, at 35]. He requested that he be given pain medication besides Meloxicam. Willcoxson also mentioned that his legs were swelling and inquired whether the swelling indicated that he had diabetes. He was given another medication, Naprosyn, that same day. *Id*. at 34. He was later tested for diabetes which produced negative results. Doc. # 27-2, at 17. Willcoxson was returned to the kitchen on November 3, 2010, and was given back his old job as a counter attendant on a permanent basis on November 8, 2010. Doc. # 26-2, at 4.

Willcoxson was seen by the medical unit again on December 1, 2010, after he complained that both of his hands were hurting him. Doc. # 27-2, at 12. A nurse practitioner noted that Willcoxson reported that his job in the kitchen required him to use his hands constantly which caused him pain. *Id.* The nurse referred Willcoxson for x-rays, but she reiterated that his work restrictions were proper and that it was his responsibility to see that security officials followed them. *Id.* Five days later, a radiologist examined the x-rays taken of Willcoxson's hands and noted degenerative changes but concluded that the changes were long standing and were not acute. *Id.* at 11.

13

On December 14, 2010, Willcoxson still again was seen after he reported experiencing back pain while sweeping the kitchen.  Doc. # 27-2, at 8.  The nurse practitioner conducting the examination observed that Willcoxson was unable to bend and touch his toes and that he had difficulty getting in and out of his chair. She also noted that he reported feeling "exquisite pain on palpitation of the lower lumbar area."  *Id*.  Willcoxson again complained that "security" was not honoring his restrictions.  *Id.*  The nurse replied that he had multiple restrictions and that it was his responsibility to see that "security" complied with them.  *Id.*  The nurse also prescribed medication and a two day lay-in.

### B.    **Defendant's Response**

The defendants argue that the evidence demonstrates without genuine controversy that they have not violated Willcoxson's constitutional rights.  They have submitted the Affidavit of Chief of Classification Officer Marie Flores (Doc. # 32-10, Exh. L); relevant portions of TDCJ Food Service Department records for Willcoxson's work assignment and job training history, along with offender safety regulations and restrictions list code descriptions (Doc. # 32-8, Exh. M); and relevant portions of the TDCJ Food Service Procedures Manual (Doc. # 32-9, Exh. N).

The defendants contend that these records show that they were not deliberately indifferent to Willcoxson's serious medical needs.   The Unit Classification Committee (the UCC) was responsible for Willcoxson's placement as a counter attendant in the kitchen, an assignment made according to TDCJ regulations after a review of Willcoxson's HSM-18 to ensure that the assigned department would not require labor which would run afoul of the designated work restrictions.  Doc. # 32-6; Doc. # 32-7, at 6-7; Doc. # 32-10, at 2.

Under the TDCJ policy, the UCC reviews an inmate's classification and custody history to determine if the inmate has work restrictions.  Doc. # 32-10, at 2.  The UCC then assigns the inmate to work in an area (such as the kitchen) in compliance with the restrictions contained in the inmate's HSM-18.  *Id.*   An inmate's initial placement in a work area is temporary (no more than 72 hours) during which the supervisor may train the inmate in the work required and make an assessment of his abilities.  *Id.* at 3.   During the temporary assignment, the supervisor may give the inmate work that does not violate his medical restrictions. *Id.*   Thereafter, the supervisor assigns the inmate a job compatible with his limitations and abilities; the job must be approved by the UCC.  *Id.*

The UCC does – but the supervisors do not – have access to the inmate's HSM-18, which contains detailed medical information.  *Id*.  Rather, the supervisors receive rosters that identify inmates' work restrictions**.**  *Id.*  Consequently, the

supervisors make their recommended assignments based on their understanding of an inmate's restrictions, but it is the UCC that makes the ultimate decision and may overrule any supervisor's assignment. *Id.*

In the present case, Willcoxson was given a temporary assignment in the kitchen on three occasions: March 26, 2009, April 29, 2009, and November 3, 2010. Doc. # 32-10, at 3. He was given the first shift (1 a.m. to 6 a.m.) each time. There is no record of what duties he was given during those initial 72-hour periods. *Id.* After the expiration of each of the three temporary assignments, Willcoxson was assigned to work as counter attendant. In that position, Willcoxson was required to serve food and beverages from the counters and steam tables to other inmates; wait on and bus tables; clean the dining room and remove waste from the area; and deliver food carts to feeding areas. *Id.* at 4; Doc. # 32-9, at 5. Counter attendants with work restrictions who are assigned to wait or bus tables are allowed to sit when work is not necessary and must be allowed to sit at least ten minutes each hour. Doc. # 32-10, at 4.

### C.   **The Court's Prior Rulings**

The Court previously granted summary judgment in favor of Dr. Williams and P.A. Powers on the ground that there was no proof that these health care workers personally were involved in assigning Willcoxson work that endangered his health or safety. The record demonstrated without contradiction that they were

16

attentive to his medical needs and ordered restrictions on his physical activities related to his jobs.  Moreover, it was proven that the medical department and its employees were not authorized to, and did not, make job assignments. Consequently, Dr. Williams and P.A. Powers were not shown to be deliberately indifferent to Willcoxson's serious health needs.

The Court ordered supplemental briefing with regard to the kitchen counter attendant assignments made by the UCC.  The Court also noted that the record did not contain any specific information showing how many shifts Willcoxson was assigned to work as a waiter, the number of hours he worked per day, or the type of labor he performed during his temporary waiter assignments.  Doc. # 31, at 29-31.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

A movant is entitled to summary judgment if he shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).  In considering such a motion, this court construes "all facts and inferences in the light most favorable to the nonmoving party."  *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotations marks omitted).  For summary judgment, the movant has the burden of showing that there is an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325.  In doing so, the

movant must establish the "absence of evidence to support an essential element of the non-movant's case." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal citations omitted). The motion for summary judgment must be denied if the movant fails to meet this initial burden. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). However, if the movant does succeed in meeting this burden, the non-movant must go beyond the pleadings and identify specific facts showing that there is a genuine issue of a material fact warranting trial. *Id.*

To prove there is an absence of evidence in support of the non-movant's claim, the movant must identify areas that are essential to the claim in which there is an "absence of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). However, the movant "need not negate the elements of the non-movant's case." *Boudreaux v. Swift Transp. Co. Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Moreover, mere conclusions and allegations are not summary judgment evidence and cannot be used to defeat or support a motion for summary judgment. *Topalian v. Ehrman*¸ 954 F.2d 1125, 1131 (5th Cir. 1992). To successfully oppose a motion for summary judgment, the non-movant must present specific facts showing "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc.*, *v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). If the non-movant fails to point out evidence opposing

summary judgment, it is not the court's duty to search the record for such evidence.  *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

## III.  <u>QUALIFIED IMMUNITY</u>

### A.  <u>Legal Standards</u>

***Qualified Immunity Proof.***—The  defendants have asserted the defense of qualified immunity, which is an affirmative defense which shields public officials from civil liability for acts committed pursuant to their authorized duties.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Manis v. Lawson*, 585 F.3d 839, 845-846 (5th Cir. 2009).  Qualified immunity protects government employees against claims brought against them in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Wernecke v. Garcia,* 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Harlow*, 458 U.S at 818) (internal quotation marks omitted).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011).  This protection is extended to "'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  It is applicable regardless of whether a government official's reasonable error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson v. Callahan*, 555 U.S.

223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  The official is immune from suit if the law at the time of the constitutional violation does not give him fair notice that the conduct is unlawful.  *Manis*, 585 F.3d at 846 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Determining whether a public official is entitled to qualified immunity entails a two part inquiry by the reviewing court.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  First, the court must consider whether, in the light most favorable to the official asserting the defense, the official's conduct violated a clearly established constitutional right.  *Id.*  If the first part is answered in the affirmative, the court must determine whether the defendants' acts were objectively reasonable in reference to whether the right was clearly established at the time of the incident in question.  *Id.*  There is no mandatory sequence that the court must follow in applying the two parts of the qualified immunity test.  *Pearson*, 555 U.S. at 236.

***Eighth Amendment Requirements.***—The Eighth Amendment to the Constitution prohibits treatment by custodial officials that inflicts wanton pain upon incarcerated felons or denies them the minimal civilized measure of life's necessities.  *Palmer v. Johnson*, 193 F.3d 346 (5th Cir. 1999); *Talib v. Gilley*, 138 F.3d 211 (5th Cir. 1998).  It protects prison inmates from being denied protection against conditions that endanger their basic health and medical needs.  *Estelle v.*

*Gamble*, 429 U.S. 97, 103 (1976).   This right prohibits a custodial officer from assigning an inmate to a task knowing that the assignment would significantly aggravate an existing serious medical condition.   *Jackson v. Cain*, 864 F.2d 1235, 1247 (5th Cir. 1989).

In order for a prison inmate to establish a complaint of being subjected to work in violation of the Eighth Amendment, the plaintiff must show that he has been forced to do work that is unnecessarily physically stressful, is unsuited to his medical condition or is life threatening.   *Id.* at 1246 (citing *Ray v. Maybry*, 556 F.2d 881, 882 (8th Cir. 1977).   Prison officials are deliberately indifferent when they knowingly compel inmates to perform jobs that are beyond their physical abilities, endanger their health or are unduly painful.   *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993).

To establish deliberate indifference, it must be shown that (1) the defendant was aware of facts from which he could deduce that the inmate's health was at risk and (2) that the defendant actually drew an inference that the potential for harm existed.   *See Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).   There must be evidence showing that the defendant actually knew of the inmate's serious medical need or condition and disregarded it.   *Brewer v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009).   An inmate's serious medical need is one that has been diagnosed by a doctor or other

health professional or one that is so obvious that even a layman would recognize that special care or attention is required when handling the inmate. *Batiste v. Theriot*, 458 F. App'x 351, 357 (5th Cir. 2012) (citing *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006)); *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987).

### B.    Analysis

#### 1.    Constitutional Violation

Willcoxson contends that his work in the kitchen violated his medical restrictions and that Captain Field, Sergeant Wilson, and that Sergeant Reed compelled him to do such work in violation of the Eighth Amendment.   The evidence does not raise a genuine fact issue that defendants violated Willcoxson's Eighth Amendment right.

First, Willcoxson's medical condition *per se* did not exempt him from working.   *Winston v. Stacks*, 243 F. App'x 805, 807 (5th Cir. 2007) (citing *Mendoza* v. *Lynaugh*, 920 F.2d 191, 195 (5th Cir. 1991).   Even if there were an evidentiary dispute about whether Willcoxson's condition prevented him from performing the duties of counter attendant in the kitchen, to prevail on such a claim, Willcoxson must prove that the defendants were personally involved and responsible for his placement.   *Hamilton v. Foti*, 372 F. App'x 480, 486 (5th Cir. 2010) (citing *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal

22

involvement is an essential element of a civil rights cause of action.")).  Also, a custodial official cannot be held to have denied an inmate's right to health or safety under the Eighth Amendment unless it is shown that the official was aware that his act or omission was exposing the inmate to the risk of serious physical harm.  *See Wilson v. Seiter*, 501 U.S. 294, 300-01 (1991).  Willcoxson has not presented admissible (that is, non-speculative and non-conclusory) evidence that Captain Fields was aware of his complaints or, more importantly, aware of any deterioration in Willcoxson's medical condition that made his work assignment unsuitable.  Captain Fields' shift was during the day from 8:00 a.m. until 5:00 p.m., while Willcoxson worked the very early morning shift from approximately 1 a.m. until 6 a.m.  Doc. # 32-3, at 2; Doc. # 27-6, at 3.  Willcoxson also has not presented evidence that he personally complained to her or demonstrated his medical condition had worsened from his work.

As to Sergeants Reed and Wilson, Willcoxson's supervisors, there is no admissible evidence that they were aware that the kitchen duties they assigned to him violated his work restrictions.  Indeed, the uncontradicted evidence is that Willcoxson's assigned job as kitchen counter attendant was within his work restrictions.  Doc. # 32-9, at 5; Doc. # 32-10, at 4.[5]  There is no probative evidence

---

[5]    It is the UCC that is authorized to make job assignments; job reassignments cannot be made unilaterally by a prison officer.  *Id.*  The sergeants were entitled to rely on the UCC's work assignment for Willcoxson, which assignment was based on the health care

that Sergeants Reed or Wilson were advised by anyone in the medical department that Willcoxson's job assignment was inappropriate or that there was concern that the assigned job duties were harmful to his physical well-being.[6]

None of the prison officer defendants had medical training, and there is no showing that Willcoxson suffered some overt injury which would be easily recognized by a layman.  If the official is not a trained health care worker, he cannot be found to be deliberately indifferent to an inmate's health unless the official had been advised by a health worker of the danger or unless the danger was so obvious that even a layman could recognize the risk.  *Gobert*; *see also Lewis v. Lynn*, 236 F.3d 766, 767-68 (5th Cir. 2001) (prison officials did not show deliberate indifference to inmate's health by requiring him to work in the field despite complaints of asthma, where officials relied on assurances by hospital staff that inmate was capable of field work despite his condition); *Shakka v. Smith*, 71 F.3d 162, 167 (5th Cir. 1995) (prison officials are entitled to rely on the expertise of trained health care providers to assess and respond to prisoners' health and safety needs).  The officer defendants could not be expected to recognize ailments

---

professionals' assessment of Willcoxson's condition when he was examined.  While Sergeants Reed and Wilson supervised Willcoxson, they had no authority to change his work assignment.  Doc. # 28, at 7; Doc. # 32-5, at 3.

[6]     In any event, at certain times, Willcoxson gave mixed signals about his physical condition and volunteered to his supervisors to perform work beyond the counter attendant duties.  Doc. # 27-3, at 60; Doc. # 32-5, at 3; Doc. # 34, at 2.

undetected by health professionals. *See Batiste*, 458 F. App'x at 356.   Their alleged failure to recognize Willcoxson's difficulties does not support a finding that they intentionally violated clearly established law regarding Willcoxson's rights under the Eighth Amendment. *See Walker v. Butler*, 967 F.2d 176, 178 (5th Cir. 1992).   Willcoxson accordingly fails to raise a genuine fact issue that the defendants knowingly compelled him to work in violation of his restrictions. *See Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *see also Norton v. Dimazana*, 122 F.3d 286 (5th Cir. 1997).

This conclusion is bolstered by the fact that Willcoxson's medical records reveal that he was seen regularly by either a doctor or a physician's assistant. Those health care professionals did not report anything demonstrating that he was harmed by being worked outside of his restrictions during the period in question. *See, e.g.,* Doc. # 26-2, at 11, 57; Doc. # 27-2, at 62; Doc. # 26-7; Doc. # 27-3, at 19, 49.

### 2.    Objective Reasonableness

Even if the Court were to assume that the work assigned to Willcoxson was harmful to him, and further assume that Willcoxson has presented evidence that the supervising officers were aware of this fact and deliberately ignored the issue, Willcoxson has not shown a genuine fact issue that the defendants' conduct was objectively unreasonable, the second prong of the qualified immunity analysis.

25

Willcoxson asserts that he complained to his supervisors about his work and thus the supervising defendants were unreasonable in their refusal to transfer him to a different job.  The supervisor defendants dispute these assertions, based on the evidence described above.  They deny that they ever forced him to work against his medical restrictions.  Doc. # 28, at 7; Doc. # 32-5, at 3.  The Court does not resolve this issue.  The Court assumes Willcoxson made such complaints.  The pivotal issue is whether the defendants were objectively unreasonable in their reaction to Willcoxson's alleged complaints.  As explained, there is no evidence that these defendants had any actual knowledge that Willcoxson's physical condition had worsened because of the duties assigned to him.  *See Winston*, 243 F. App'x at 806.  Deliberate indifference requires proof that the defendants' acts or omissions were the product of reckless intent.  *McCormick v. Stadler*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citing *Farmer*, 511 U.S. at 839).  Indeed, under Fifth Circuit authority, the defendants are not liable even if they were grossly negligent in supervising Willcoxson.  *Id*. at 645.   It is not enough to prove that they should have known that Willcoxson's work requirements may have been too much for him.  *Hare v. Corinth, Miss*., 74 F.3d 633, 650 (5th Cir. 1996).  The defendants were aware that the medical unit had repeatedly examined Willcoxson and not found medical deterioration or issues they attributed to his work duties.  The UCC, the body with responsibility for work assignments, reviewed the record and did not

26

change the assignment.  Accordingly, Willcoxson has not raised a genuine fact issue that the defendants were objectively unreasonable in their continued assignment of kitchen counter duties to him.

On the record presented, the Court concludes that the actions of Captain Field and Sergeants Reed and Wilson were not objectively unreasonable.  *See Batiste*, 458 F. App'x at 356.  The defendants are entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows:

1.    The defendants' motion for summary judgment [Doc. # 32] is **GRANTED.**

2.    The prisoner civil rights complaint is **DISMISSED** with prejudice.

**The Clerk is directed to provide a copy of this Memorandum and Order to the parties.**

SIGNED at Houston, Texas on November 27, 2012.

Nancy F. Atlas
United States District Judge

27